Timothy M. Frank (California Bar No. 263245)
timothy.frank@hnbllc.com
Stephen M. Ferguson (*pro hac vice* to be filed)
stephen.ferguson@hnbllc.com
HAGAN NOLL & BOYLE LLC
820 Gessner, Suite 940
Houston, Texas 77024
Telephone: (713) 343-0478
Facsimile: (713) 758-0146

David A. Van Riper (California Bar No. 128059)
dave@vanriperlaw.com
VAN RIPER LAW
1254 Irvine Blvd., Suite 200
Tustin, California 92780
Telephone: (714) 731-1800
Facsimile: (714) 731-1811

Attorneys for Plaintiff DISH Network L.L.C.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DISH NETWORK L.L.C., <br><br> Plaintiff, <br><br> v. <br><br> INNETRA PC, and <br> ELNA PAULETTE BELLE, <br><br> Defendants. | Case No. <br><br> **PLAINTIFF'S COMPLAINT** |

Plaintiff DISH Network L.L.C. ("DISH") brings this suit against Defendants Innetra PC, and Elna Paulette Belle (collectively "Defendants").

## Nature of the Action

1.      Plaintiff DISH Network L.L.C. ("DISH") is one of the largest pay-tv providers in the United States and has millions of subscribers nationwide. This case concerns the infringement of DISH's copyrights in programming ("Works") that aired on 22 Arabic, Hindi, and Bangla language channels that DISH exclusively licensed for transmission in the United States ("Channels").

2.      DISH's copyrights in the Works were directly infringed because, without DISH's authorization, the Works were transmitted through pirate streaming services ("Pirate Services") to users of those services in the United States ("Users"). These Pirate Services depend upon hosting providers to furnish the servers and network infrastructure needed to transmit the Works over the internet to their Users.

3.      Defendant Innetra PC ("Innetra") materially contributed to and induced the Pirate Services' direct infringement of the Works by providing the servers and network infrastructure that the Pirate Services used to transmit the Works, including upstream and peering servers in the United States. Innetra openly advertises that it does not comply with United States copyright law and does not require its customers, such as the Pirate Services, to abide by such law.

4.      Innetra had actual knowledge of the Pirate Services' infringement of the Works because DISH, on hundreds of occasions, expressly requested that Innetra halt the specific infringing activities occurring on its servers and network. Innetra possessed the means to take simple measures to stop the infringement – such as removing or disabling the infringing streams or terminating the accounts of the Pirate Services due to their repeated infringement – yet Innetra refused to take such measures, choosing instead to continue profiting from the Pirate Services' direct infringement.

5.      Innetra is liable for contributory and vicarious copyright infringement. Defendant Elna Paulette Belle ("Belle"), is also personally liable because, on information and belief, she authorized, directed, participated in, and received direct financial benefit from Innetra's

**PLAINTIFF'S COMPLAINT**

infringement, including by managing the servers and network the Pirate Services used to infringe the Works and, despite DISH notifying her of this infringement, failing to exercise her ability to stop it.

## Parties

6.     Plaintiff DISH Network L.L.C. is a limited liability company organized under Colorado law, with its principal place of business at 9601 South Meridian Blvd., Englewood, Colorado 80112.

7.     Defendant Innetra PC is a limited partnership organized under United Kingdom law, with its principal place of business at Suite 429, Apex House, Thomas Street, Trethomas, Caerphilly, Wales CF83 8DP.

8.     Defendant Elna Paulette Belle (formerly Elna Paulette Lafortune) is an individual believed to reside in the United Kingdom. Belle is Innetra PC's general partner and as such had the right and ability to, and on information and belief did in fact, authorize, direct, or participate in, and receive direct financial benefits from, the infringing activities of Innetra alleged herein.

## Jurisdiction and Venue

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because DISH asserts claims under the Copyright Act, 17 U.S.C. § 101 *et seq.*

10.     The Court has personal jurisdiction over Innetra pursuant to Federal Rule of Civil Procedure 4(k)(2), which considers Innetra's contacts with the Unites States as a whole. Rule 4(k)(2) applies because DISH's claims arise under federal law and, upon information and belief, Innetra is not subject to the jurisdiction of the courts of general jurisdiction of any state. Innetra has sufficient contacts with the United States to support personal jurisdiction under Rule 4(k)(2) because it purposefully directed its infringing conduct at the United States by appealing to and profiting from customers wanting to serve the United States market while avoiding the implications of United States copyright law, such as the Pirate Services, knowing these customers were harming DISH in the United States.

11.     Innetra, when asked whether its services were suitable for streaming television content in the United States, responded "Yes, we have a lot of fully satisfied customers that do IPTV business in the US."



Hello.
Thank you for your request.
Yes, we have a lot of fully satisfied customers that do IPTV business in the US.
I advise you to start with a best-selling dedicated server for the LOAD - https://innetra.co m/cart.php?a=add&pid=156
Next you can add more servers like this, storage servers with HDD or SSD or NVMe for VOD. If you need a dedicated server for MAIN, I can advise you to order a 36 core CPU dedicated server like https://innetra.com/cart.php?a=add&pid=148

------------------------------------------
Ticket ID: #396737
Subject: Hosting for my IPTV

12.     Innetra appealed to these customers, including the Pirate Services, by entering into peering arrangements with United States companies to use their servers and networks in the United States to deliver the customers' traffic to Users in the United States. Innetra contracted with peers such as Lumen Technologies, Inc. (formerly Level 3) and NTT America, Inc. because, upon information and belief, they were well-positioned to deliver traffic throughout the United States using their datacenters and network infrastructure in the United States. Without these peering arrangements, Innetra would have been unable to deliver the traffic as effectively to Users.

13.     Innetra also appealed to customers wanting to serve the United States market, including the Pirate Services, by advertising that it disregards the DMCA and in fact by disregarding the DMCA. Innetra includes a frequently asked question on several pages of its website asking "How do you handle DMCA notices?" and answers it with "[w]e do our best to keep our customers online, and to achieve that, we protect our customers from illegitimate DMCA claims."[1] Innetra does not address the copyright laws of any country other than the United States. Innetra failed to prevent its customers such as the Pirate Services from transmitting infringing

---

[1] https://innetra.com/streaming; https://innetra.com/dedicated-servers; https://innetra.com/vps.php; https://innetra.com/storage-hosting;

PLAINTIFF'S COMPLAINT

content to the United States and failed to prevent Users in the United States from accessing that content.

14.     Innetra also designed its website to appeal to customers located in the United States. By default, Innetra quotes the cost of its servers and network services on its website in United States dollars.[2] Although Innetra also accepts payments in Euros (EUR) and British Pounds (GBP), a visitor to the Innetra website must affirmatively make that change.  And when ordering from the website, customers inputting their telephone number associated with their billing details are presented with a dropdown box to select their phone number country code, and the option of using a United States country code (and a United Kingdom country code) are presented first and above a line separating that option from an alphabetical list of countries and their country codes, where United Kingdom and United States are also included.[3]



15.     Innetra profited from the audience of Users in the United States because its customers such as the Pirate Services paid Innetra to use its servers and network to deliver infringing content to them. DISH, on the other hand, was harmed in the United States because

---

[2] https://innetra.com/order.php?pid=144
[3] *Id.*

Innetra's infringing conduct occurred there, damaging the value of DISH's exclusive copyrights, and because, upon information and belief, the Works were transmitted to Users nationwide that avoided paying subscription fees to DISH. DISH was also harmed in the United States because it is a United States company and holds the copyrights at issue only for the United States.

16.     The Court has personal jurisdiction over Belle pursuant to Rule 4(k)(2), because Belle, on information and belief, is a primary participant in Innetra's infringing conduct or had control of and at least direct participation in such activities. Belle was personally notified of the infringement of the Works taking place on the network and servers that she managed, but she failed to stop the infringement. On information and belief, Belle financially benefited from that infringement as the general partner of Innetra.

17.     The Court's exercise of personal jurisdiction over Defendants pursuant to Rule 4(k)(2) is reasonable and consistent with the United States Constitution and United States law because Defendants' purposeful interjection into the United States is substantial, the burden of them having to defend in this Court is minimal, and this Court is the most appropriate forum to decide this case. Innetra, in addition to its peering arrangements and DMCA-related advertising and anti-enforcement practices that target the United States, and in addition to designing its website to target and appeal to users from the United States, uses other United States companies to support its business and promote its services, including Visa, Mastercard, PayPal, and Cloudflare through which its website is registered and supported. Innetra is an established company that is believed to generate millions of dollars in revenues annually. The United States has an interest in having its copyright laws enforced in its federal courts, while DISH has an interest in protecting itself in a United States federal court, perhaps the only forum where DISH can effectively enforce its United States copyrights for infringement that occurred in the United States.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to DISH's claims occurred in this district; under § 1391(b)(3) because Defendants are each subject to personal jurisdiction in this district; and under § 1391(c)(3) because as nonresidents of the United States they may be sued in any district. Venue is also proper under 28 U.S.C. § 1400(a) because the case involves Copyright Act violations.

PLAINTIFF'S COMPLAINT

**DISH's Copyrights**

19.     DISH provides the Channels to its subscribers pursuant to agreements that it entered into with the Channels' owners or their agents ("Networks"). The Networks and Channels include: B4U U.S., Inc. (*B4U Movies*); Bennett, Coleman and Company Limited (*Times Now* and *Zoom*); GloboSat Entertainment LLC (*Sahara One* and *Sahara Samay*); International Media Distribution (Luxembourg) S.A.R.L. (*Al Hayah 1, ART Aflam 1, ART Aflam 2, ART Cima, Hekayat, LBC, and LBCI*); MSM Asia Limited (*SET, SET MAX,* and *SAB*); Soundview ATN LLC (*ATN Bangla*); Soundview Broadcasting, L.L.C. (*ATN News* and *NTV Bangla*); and World Span Media Consulting, Inc. (*CBC, CBC Drama, Melody Aflam,* and *Melody Classic*).

20.     The Networks acquire copyrights in the Works that air on their respective Channels, including by producing the Works and by assignment. The copyrighted material includes Works registered with the United States Copyright Office and additional unregistered Works.[4] Several of the Works involve series, for which each episode constitutes a separate copyrighted Work.

21.     DISH entered into signed, written licensing agreements with the Networks granting DISH the exclusive right to distribute and publicly perform the Works that air on the Channels in the United States, by means that include satellite, over-the-top (OTT), internet protocol television (IPTV), and internet.

22.     DISH's exclusive rights to distribute and publicly perform the Works were in effect when the Pirate Services transmitted them through Innetra's servers and network. DISH's exclusive distribution and public performance rights remain in effect with respect to Works aired on many of the Channels.

**The Pirate Services' Infringement**

23.     Digital video piracy was found to cause the United States economy to lose at least $29.2 billion in revenue each year, with more than 80% of this piracy being attributable to illegal streaming services such as the Pirate Services.[5] The Pirate Services were able to provide Users thousands of channels, and tens of thousands of video-on-demand (VOD) programs, at a fraction

---

[4]Exhibit 1 (illustrative list of Works subject to registration) and Exhibit 2 (illustrative list of unregistered Works).
[5]Global Intellectual Property Center, Impacts of Digital Piracy on the United States Economy (June 2019), available at https://www.uschamber.com/assets/documents/Digital_Video_Piracy_June_2019.pdf.

**PLAINTIFF'S COMPLAINT**

of the cost charged by legal providers such as DISH, at least in part, because the Pirate Services did not pay fees to license the content they provide.

24. The Pirate Services transmitted the Works to Users over the internet using Innetra's servers and network as part of linear streams of the Channels or on a VOD basis. Users accessed the Works through a set-top box (STB), app, or website that links to the Works or provides a playlist used to access the Works. Users often had to purchase a subscription to view the Pirate Services' content, in addition to purchasing any required STB. DISH did not authorize the Pirate Services to distribute or publicly perform the Works and received no compensation from them.

25. The Pirate Services largely conducted their infringing businesses over the internet and engaged in efforts to disguise the true identities of their operators. For this complaint, the Pirate Services are identified by one or more IP addresses associated with Innetra's servers and network from which the Works were transmitted, along with any domain name incorporated in the URL that was used in transmitting the Works and any Pirate Service brand name that was used in accessing them, which forms an illustrative list of Pirate Services that used Innetra's servers and network to directly infringe DISH's copyrights.[6]

26. The scale of the Pirate Services' direct infringement of the Works is extensive. The Pirate Services that transmitted linear streams of the Channels that aired the Works often did so 24 hours per day and 7 days per week, in some cases for several years, meaning these Pirate Services alone infringed a substantial number of Works. The Pirate Services that transmitted the Works on a VOD basis add to this already significant amount of infringement.

27. The Pirate Services were notified of their infringement multiple times but have not stopped infringing DISH's copyrights.

**Innetra's Streaming Solutions**

28. Innetra furnishes an array of services designed to ensure its customers' uninterrupted online presence and growth.[7] It offers high-bandwidth media streaming hosting tailored for the Pirate Services, promoting solutions for IPTV, media, and game streaming with robust server

---

[6]Exhibit 3 (illustrative list of Pirate Services).
[7] https://innetra.com/

PLAINTIFF'S COMPLAINT

infrastructure.[8]

29.     Innetra provides dedicated servers and virtual private servers (VPS) to facilitate the transmission of content over the internet, enabling customers to deliver streaming services efficiently.[9]

30.     Innetra's dedicated servers boast connections up to 100+ gigabits per second, customizable to meet demanding requirements, such as those of Pirate Services transmitting vast content volumes.[10] Innetra describes its servers as ensuring optimal network routes, low latency, and no bottlenecks, jitter, or packet loss, supported by substantial idle bandwidth for high load projects.[11]

31.     Innetra's VPS operates on high-performance equipment in Tier-III data centers, integrated into high-availability clusters. Each node features a redundant 40 Gbps internet connection to prevent bottlenecks, and content hosted on VPS is optimized via a Content Processing and Delivery Network.[12]

32.     Innetra charges customers based on selected server features and configurations, tailoring costs to specific services that each customer utilizes, including additional costs for additional bandwidth.[13]

33.     For additional fees, Innetra offers storage servers and advertises them as having "[d]ata privacy and safety policies [to] protect a business from leaking and fake legal activities." It also provides IP transit services, enabling customers to connect to Innetra's network, transmit traffic via optimal routes, and integrate their networks in a resilient internet framework.[14]

34.     Responding to a prospective customer seeking to establish an IPTV business in the United States, Innetra stated "we have a lot of fully satisfied customers that do IPTV business in the US" and advising the prospective customer "to start with a best-selling dedicated server for the LOAD," "you can add more servers like this, storage servers with HDD or SSD or NVMe for

---

[8] https://innetra.com/streaming
[9] https://innetra.com/dedicated-servers; https://innetra.com/vps.php
[10] https://innetra.com/dedicated-servers
[11] *Id.*
[12] https://innetra.com/vps.php
[13] *Id.;* https://innetra.com/vps.php
[14] https://innetra.com/storage-hosting; https://innetra.com/ip-transit.php

**PLAINTIFF'S COMPLAINT**

VOD," and "[i]f you need a dedicated server from MAIN, I can advise to order a 36 core CPU dedicated server." Innetra also provided links to the recommended servers in an Innetra shopping cart with each server's specifications. (*See* ¶ 14 above, Innetra's Response.)

35.    Innetra provided the Pirate Services with servers and network infrastructure, including upstream and peering servers across the United States, used to transmit the Works to Users. It may have further provided storage servers and IP transit services to support these transmissions.

### Innetra's Policy of Noncompliance with the DMCA

36.    Innetra deliberately attracts streaming services that violate United States copyright law, such as the Pirates Services, by promoting a policy designed to shield customers from Digital Millennium Copyright Act (DMCA) takedowns, and by keeping infringing activities online.[15] This policy of noncompliance is articulated in Innetra's Acceptable Use Policy (AUP), which declares that Innetra "will not substitute itself for a court of law in deciding tort claims raised by the third party."[16]

37.    Defendants received written notices requesting the removal of or disabling of access to Works transmitted by the Pirate Services from Innetra's servers and network that were infringing DISH's copyrights ("Infringement Notices"). On information and belief, Defendants received these notices because they were sent by mail and email to valid addresses used by Defendants. On March 6, 2024, Innetra responded to one such notice, asserting it would not comply. Collectively, Defendants were the recipients of at least 309 Infringement Notices.

38.    The Infringement Notices complied with the Digital Millennium Copyright Act, 17 U.S.C. § 512. The Infringement Notices contained, among other things, information reasonably sufficient for Innetra to locate the infringing material, including the IP address or URL associated with Innetra's server from which the infringing material was transmitted. Innetra was sent Infringement Notices regarding the Channels on which the Works aired, prior to the Pirate Services transmitting the Works.

---

[15] https://innetra.com; https://innetra.com/streaming; https://innetra.com/dedicated-servers; https://innetra.com/vps.php; https://innetra.com/storage-hosting;
[16] https://innetra.com/documents/AUP_1.2.pdf

PLAINTIFF'S COMPLAINT

39.     Other than Innetra's March 6, 2024 response, Innetra failed to acknowledge or act upon the Infringement Notices, permitting the Pirate Services to continue infringing DISH's copyrights using the same reported IP addresses and URLs. Innetra's inaction of willfully ignoring the Pirate Services' violations is consistent with its DMCA noncompliance policy and its AUP.

40.     Innetra is ineligible for DMCA safe harbor defenses due to its failure to adopt and implement a policy for terminating repeat infringers. Further, Innetra lacks a designated DMCA agent to receive infringement notices, does not expeditiously remove or disable access to infringing material upon obtaining knowledge of infringement, and derives financial benefits directly from infringement within its control.

**Innetra's Control Over the Infringement**

41.     Innetra could have taken simple measures to stop the Pirate Services from infringing the Works but refused to take them. Innetra could have removed or disabled access to the particular material identified in the Infringement Notices that was transmitted from its servers and network. Innetra also could have implemented a multi-strike policy, such as by temporarily suspending a Pirate Services' account on receipt of one notice advising of infringement against that account and then permanently terminating the account on receipt of additional notices.

42.     Innetra also had the legal right to stop the Pirate Services from infringing the Works. Innetra's service agreement with its customers says "[a]ll Services can be partially or totally suspended or immediately canceled by the Provider if the Customer should violate its obligations," "the Customer is obliged to . . . not in any form violate the rights, laws and interests of . . . third parties," and "[t]he Customer agrees he has no intentions to join any actions capable of being performed through the Service, which violates any applicable local, provincial, state, national or international law, statute ordinance, rule or regulation."[17] The customer's use of Innetra's services to infringe "copyright laws" is specifically "regarded as a violation of these Terms by the Customer" giving Innetra "the right to unilaterally suspend or cancel the Service."[18] Rather than exercise this right and ability to stop the Pirate Services' infringement, Innetra turned a blind eye, making its servers and network a safe haven for the Pirate Services' infringement.

---

[17] https://innetra.com/documents/ToS_1.2.pdf, §§ 5.4 and 6.3.
[18] *Id.* §§ 6.3, 6.5, and 6.5.2.

**PLAINTIFF'S COMPLAINT**

**Innetra's Direct Financial Interest in the Infringement**

43.     On information and belief, the Pirate Services were drawn to Innetra's servers and network because it did not stop their infringement, and the Pirate Services perceived Innetra's servers and network as a place where infringement of the Works was tolerated because Innetra advertised them as such and many other Pirate Services did just that. The ongoing availability of the Works resulting from Innetra's failure to take any action against the Pirate Services served as a draw for those Pirate Services to remain paying customers of Innetra and attracted other Pirate Services to become paying customers of Innetra.

44.     Innetra's pricing is based in part on the bandwidth that the customer selects, typically offered in gigabits per second (Gbps). Innetra, for example, charges more for up to a 100 Gbps server, which it used for high bandwidth applications such as streaming, than it charges for up to a 10 Gbps server that provides less bandwidth.[19]

45.     On information and belief, the Pirate Services' bandwidth needs factored into their purchases from Innetra, in terms of purchasing more expensive servers to acquire greater bandwidth, additional bandwidth al-a-carte, or additional servers to transmit the Works and other content. Innetra refused to take any measures to stop the Pirate Services from infringing the Works because that would have worked to reduce the Pirate Services' bandwidth requirements and in turn their need to purchase bandwidth from Innetra, and drive the Pirate Services and potential pirate services away from Innetra.

**Claims for Relief**

**Count I**

**(Materially Contributing to Copyright Infringement under 17 U.S.C. § 501)**

46.     DISH repeats and realleges the allegations in paragraphs 1-45.

47.     DISH is a copyright owner under 17 U.S.C. § 106 because, at all relevant times, DISH held the exclusive rights to distribute and publicly perform the Works in the United States, by means that include satellite, OTT, IPTV, and internet.

---

[19]https://innetra.com/dedicated-servers

PLAINTIFF'S COMPLAINT

48.    The Works are copyrightable subject matter because they are original audiovisual works fixed in a tangible medium of expression. DISH's copyrights in the Works arise under laws of nations other than the United States that are parties to copyright treaties with the United States, including Egypt, Lebanon, Saudi Arabia, India, and Bangladesh, where the Works were authored and first published.

49.    The Works constitute non-United States works under 17 U.S.C. §§ 101 and 411, and therefore registration with the United States Copyright Office is not a prerequisite to filing a copyright infringement action for the Works. Nonetheless, several Works are registered with the United States Copyright Office.

50.    DISH's exclusive rights to publicly perform the Works were directly infringed by the Pirate Services' unauthorized transmission of the Works to Users. The Works were transmitted to Users when DISH's exclusive rights to publicly perform the Works were in effect.

51.    Innetra materially contributed to the Pirate Services' direct infringement of DISH's exclusive public performance rights by providing the Pirate Services the servers and network used to transmit the Works. Innetra also offered storage servers and IP transit services, which it marketed and sold to streaming services such as the Pirate Services as a recommended add-on to its server and network packages. On information and belief, Innetra provided these additional types of servers and services to at least some of the Pirate Services.

52.    Innetra had actual knowledge that the transmission of the Works to Users infringes DISH's exclusive public performance rights and that its servers and network were being used to commit such infringement on a massive scale. The Infringement Notices informed Innetra of this specific infringement, including the IP addresses and URLs that correspond with specific servers and specific locations on those servers within Innetra's network that were used to transmit the Works.

53.    Innetra could have taken simple measures to prevent the Pirate Services from infringing DISH's exclusive rights to publicly perform the Works, including by removing or disabling access to the Works or by terminating the Pirate Services' accounts. Innetra failed to take such measures and continued to provide access to the Works.

54.    Belle authorized, directed, and participated in Innetra's infringement of the Works. On information and belief, Belle managed the servers and network that the Pirate Services used to infringe the Works. Belle was notified of the infringement taking place on the servers and network that she managed and she failed to stop the infringement. Belle owns Innetra, serves as its general partner, and receives direct financial benefits from its infringing acts. Belle is a guiding spirit and central figure in Innetra's infringement of the Works and therefore Belle is personally liable for such infringement.

55.    The actions of Defendants were willful, malicious, intentional, and purposeful, and in disregard of and with indifference to the rights of DISH. The actions of Defendants are continuing with respect to many of the Pirate Services.

56.    Unless enjoined by the Court, Defendants will continue engaging in acts that cause substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

## <u>Count II</u>

### (Inducing Copyright Infringement under 17 U.S.C. § 501)

57.    DISH repeats and realleges the allegations in paragraphs 1-45, 47-50, and 54.

58.    Innetra provided the servers and network that the Pirate Services used to infringe DISH's exclusive rights to publicly perform the Works. Innetra promoted the use of its servers and network for such infringement with its policy of noncompliance with the DMCA, under which Innetra informed the Pirate Services that it would not comply with United States copyright law and would not take any measures to stop them from infringing the Works.

59.    Innetra did not develop filtering tools or any other mechanisms to diminish the Pirate Services' infringement of the Works, but could have taken simple measures to stop that infringement such as by removing or disabling access to the Works or by terminating the Pirate Services' accounts.

60.    Belle authorized, directed, and participated in Innetra's infringement of the Works, as explained above, and therefore she is personally liable for such infringement.

61.    The actions of Defendants were willful, malicious, intentional, and purposeful, and

PLAINTIFF'S COMPLAINT

in disregard of and with indifference to the rights of DISH. The actions of Defendants are continuing with respect to many of the Pirate Services.

62.     Unless enjoined by the Court, Defendants will continue engaging in acts that cause substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

## **Count III**

### **(Vicarious Copyright Infringement under 17 U.S.C. § 501)**

63.     DISH repeats and realleges the allegations in paragraphs 1-45, 47-50, and 54.

64.     Innetra had the legal right and practical ability to stop or limit the Pirate Services' infringement of the Works. Innetra could have removed or disabled access to the Works transmitted from its servers and network or terminated the Pirate Services' accounts and shut them down completely. Innetra was authorized to take these simple measures to stop the infringement of the Works under its service agreements with the Pirate Services. Innetra failed to exercise its right and ability to control the Pirate Services' infringement of the Works.

65.     Innetra had a direct financial interest in the Pirate Services' infringement of the Works and received direct financial benefits from such infringement. The Pirate Services were motivated to become Innetra's customers because they knew that they could publicly perform the Works without interference from Innetra. Innetra's failure to stop the Pirate Services' infringement of the Works served as a draw for those Pirate Services to remain paying customers of Innetra and attracted other Pirate Services to Innetra's servers and network. By failing to remove or disable access to the Works or terminate the Pirate Services' accounts, Innetra received illicit revenue that it would not otherwise have received.

66.     Innetra encouraged the Pirate Services to purchase sufficient bandwidth to transmit content using Innetra's servers and network. On information and belief, the Pirate Services purchased this bandwidth from Innetra in the form of more expensive servers, additional servers, or on an al-a-carte basis. The Pirate Services' transmission of the Works helped to keep their bandwidth needs elevated and Innetra was able to sell them that necessary bandwidth. Innetra did

not stop the Pirate Services from transmitting the Works because it would have worked to reduce Innetra's own profits.

67.    Belle authorized, directed, and participated in Innetra's infringement of the Works, as explained above, and therefore she is personally liable for such infringement.

68.    The actions of Defendants were willful, malicious, intentional, and purposeful, and in disregard of and with indifference to the rights of DISH. The actions of Defendants are continuing with respect to many of the Pirate Services.

69.    Unless enjoined by the Court, Defendants will continue engaging in acts that cause substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

**Prayer for Relief**

Judgment against Defendants should include:

A.    A permanent injunction under 17 U.S.C. § 502 that prohibits Defendants, and any officer, agent, servant, employee, attorney, or any other person acting in active concert or participation with either of them, from infringing DISH's copyrights in the Works, including by (1) distributing or publicly performing this material in the United States, which includes streaming or transmitting the material; (2) contributing to, inducing, or failing to stop or limit the distribution or public performance of this material, which includes a prohibition on providing any servers or network used in streaming or transmitting the material and requires termination of any current or future accounts of the Pirate Services;

B.    Statutory damages up to $150,000 for each registered Work infringed (including the 171 registered Works identified by example in Exhibit 1) under 17 U.S.C. § 504(c), or Defendants' profits that are attributable to the infringement of those registered Works under 17 U.S.C. § 504(b);

C.    Defendants' profits that are attributable to the infringement of each unregistered Work under 17 U.S.C. § 504(b);

D.    DISH's attorneys' fees and costs under 17 U.S.C. § 505;

E.    Impoundment and disposition of all infringing articles under 17 U.S.C. § 503;

F.      Pre-judgment and post-judgment interest on all monetary relief, from the earliest date permitted by law at the maximum rate permitted by law;

G.      Such additional relief as the Court deems just and equitable.

Dated: May 6, 2025

Respectfully submitted,

By:    */s/ Timothy M. Frank*
Timothy M. Frank (California Bar No. 263245)
timothy.frank@hnbllc.com
Stephen M. Ferguson (*pro hac vice* to be file)
stephen.ferguson@hnbllc.com
HAGAN NOLL & BOYLE LLC
820 Gessner, Suite 940
Houston, Texas 77024
Telephone: (713) 343-0478
Facsimile: (713) 758-0146

David A. Van Riper (California Bar No. 128059)
dave@vanriperlaw.com
VAN RIPER LAW
1254 Irvine Blvd., Suite 200
Tustin, California 92780
Telephone: (714) 731-1800
Facsimile: (714) 731-1811

Attorneys for Plaintiff DISH Network L.L.C.